Slip Op.14- 19

UNITED STATES COURT OF INTERNATIONAL TRADE

ZHAOQING NEW ZHONGYA ALUMINUM
CO., LTD. AND ZHONGYA SHAPED
ALUMINUM (HK) HOLDING LTD.,                    Before: Donald C. Pogue,
          Plaintiffs,                                   Chief Judge

               and                             Court No. 11-00181

EVERGREEN SOLAR, INC.,
          Plaintiff-Intervenor,

               v.

UNITED STATES,

          Defendant,

               and

ALUMINUM EXTRUSIONS FAIR TRADE
COMMITTEE,
          Defendant-Intervenor.

[Department of Commerce's Remand Results are AFFIRMED]

                              Dated: February 19, 2014

Tara K. Hogan, Trial Attorney, Commercial Litigation Branch,
Civil Division, U.S. Department of Justice, of Washington, DC,
for Defendant.  With her on the briefs were Stuart F. Delery,
Acting Assistant Attorney General, Jeanne E. Davidson, Director,
and Reginald T. Blades, Jr., Assistant Director. Of counsel on
the briefs was Joanna Theiss, Attorney, Office of the Chief
Counsel for the Import Trade Administration, U.S. Department of
Commerce, of Washington, DC.

<u>Alan H. Price</u>, <u>Derick G. Holt</u>, <u>Laura El-Sabaawi</u>, <u>Maureen E. Thorson</u>, <u>Robert E. DeFrancesco,</u> Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor, Aluminum Extrusions Fair Trade Committee.


**OPINION**

**Pogue, Chief Judge:**  This case returns to court following a remand ordered by <u>Zhaoqing New Zhongya Aluminum Co. v. United States</u>, __ CIT ___,929 F. Supp. 2d 1324 (2013)(<u>"Zhaoqing Remand</u>").  The Zhaoqing Remand required the Department of Commerce ("Commerce" or "the Department") to review the proper benchmark for measuring the value of the subsidy provided to New Zhongya Aluminum Company, Ltd. and its affiliates (collectively "New Zhongya") in the form of land use rights in the Zhaoqing High-Technology Industry Development Zone ("ZHTIDZ") in China. The Department responded to the <u>Zhaoqing Remand</u> by issuing <u>Final Results of Redetermination Pursuant to Court Remand</u>, ECF No. 75 (Aug. 21, 2013) ("<u>Remand Results</u>").

    In the <u>Remand Results</u>, Commerce revised its initial determination to use the price of developed industrial land in Thailand as a benchmark for valuing New Zhongya's subsidy and accepted instead the indicative price of land in the Subic Bay Freeport Zone in the Philippines ("Subic Bay") as reported by the private firm Coldwell Banker Richard Ellis. <u>Remand Results</u> at 7.

Defendant-Intervenor, the Aluminum Extrusions Fair Trade Committee ("AEFTC") now raises two challenges to the determination in the Remand Results.[1]  AEFTC first claims that the use of property in the Philippines as a benchmark for the subsidy received by New Zhongya is contrary to the Department's practice and precedent.  AEFTC's second claim is that there is insufficient record evidence on the Philippines to support the use of Subic Bay as a benchmark, and that Commerce must therefore reopen the administrative record in order to reasonably support its selection.

As explained below, the selection of lower infrastructure properties in Subic Bay as a land value benchmark is a reasonable response to the Zhaoqing Remand.  While the Department selected Subic Bay without reference to the full range of evidence used in some prior comparable cases, its decision is neither inconsistent with the Department's precedent and practice nor unreasonable.

The second objection raised by AEFTC also fails.  While additional record evidence regarding either Subic Bay or comparably undeveloped Thai land could produce a more accurate estimate of the New Zhongya subsidy, the facts in this case do

---

[1] Neither Plaintiffs Zhaoqing New Zhongya Aluminum Co. and Zhongya Shaped Aluminum Holding, nor Plaintiff-Intervenor Evergreen Solar have challenged the Remand Results.

not show that Department's refusal to accept such evidence was
an abuse of discretion.

The court continues to hold jurisdiction over this matter
pursuant to 28 U.S.C. § 1581(c).


### BACKGROUND

As part of its investigation of certain aluminum extrusions
from the People's Republic of China ("China" or the "PRC"), the
Department concluded, <u>inter alia</u>, that countervailing duties
were appropriate to offset the subsidy given to New Zhongya in
the form of reduced costs for land use rights in the ZHTIDZ.
<u>See</u> <u>Aluminum Extrusions from the People's Republic of China</u>, 76
Fed. Reg. 18,521 (Dep't Commerce Apr. 4, 2011) (affirmative
countervailing duty determination) and accompanying Issues &
Decision Mem., C-570-968 (Mar. 28, 2011) ("<u>I&D Memo</u>") at cmt.
23.  Based on the impossibility of finding an adequate domestic
or international market price with which to compare ZHTIDZ land
use rights, Commerce determined that it was appropriate to
employ a "third tier" method and calculate the subsidy value by
comparing the price that New Zhongya paid for its land use
rights with market-based prices for comparable land in a country
at a similar level of economic development and in reasonable

proximity to the PRC.[2] Remand Results at 2.  For this comparison,
the Department selected "indicative land values" from a fully
developed industrial park in Bangkok, Thailand, as a benchmark.
I&D Memo at cmt. 24.  These indicative values were taken from a
Coldwell Banker Richard Ellis (CBRE) Industrial Property Guide,
part of a series of industry reports produced by a commercial
real estate services firm operating across Asia.[3] Id.

New Zhongya challenged the use of the Thai benchmark during
the administrative review and on appeal to this court.  New
Zhongya argued that the benchmark Thai industrial land was not
comparable to the sites made available in the ZHTIDZ as required
by 19 U.S.C. § 1677 and 19 C.F.R. § 351.511(a). Pl. Mot. for
Judgment on the Agency Record ECF No. 44 ("Pl's Mot.") at 4.

---

[2] Commerce had earlier determined that the provision of land use
rights of this type constitutes a countervailable subsidy and
developed its justification for using a third country comparison
to estimate the size of the subsidy in accordance with § 771(5)
of The Tariff Act of 1930, 19 U.S.C. § 1677(5) (all further
references to the Tariff Act of 1930, as amended, are to the
relevant portions of Title 19 of the U.S. Code, 2006 edition)
and 19 C.F.R. § 351.511. See Laminated Woven Sacks From the
People's Republic of China, 72 Fed. Reg. 67,893 (Dec. 3, 2007)
(Preliminary Affirmative Determination) ("LWS from the PRC") at
67,905, affirmed in Laminated Woven Sacks From the People's
Republic of China, 73 Fed. Reg. 35,639 (Jun. 24, 2008) (Final
Affirmative Determination) at cmt. 11.

[3] A description of CBRE and the range of commercial real estate
services they provide to investors throughout Asia appears at
CBRE Industrial MarketView 2Q 2007, ECF No. 82-2 at 69.
Commerce has relied upon CBRE reports for land value questions
in previous cases. LWS from the PRC at 67,908-09.

New Zhongya claimed that several differences precluded any valid comparison between these sites.  The most significant of these differences was the highly developed state of physical infrastructure available at the Bangkok site compared to the ZHTIDZ. Id. at 5.  To correct this alleged error in the Department's analysis, New Zhongya advocated either the use of indicative industrial land prices from the Subic Bay Freeport development site in the Philippines or a downward adjustment to the indicative prices for the Thai sites. Confidential Response in opposition to motion for judgment on the agency record ECF No. 55 at 8.  The dispute over this determination centered on the evidence used by the Department to evaluate the infrastructure available at the ZHTIDZ site when taken over by New Zhongya.

The Zhaoqing Remand ordered reconsideration or further explanation of the Department's rationale for using the indicative values given in the CBRE Reports for Thai industrial land. See Zhaoqing Remand, 929 F. Supp. 2d at 1327-29.  The record evidence did not adequately support the Department's use of industrial real estate in Thailand that was already equipped with extensive physical and logistical infrastructure as a benchmark for comparison with land in the ZHTIDZ that required extensive improvement by New Zhongya before productive use.

Specifically, the court ruled that the Department's
determination was unreasonable in its reliance on two pieces of
relatively ambiguous evidence – a promotional web site and a
series of photographs the provenance of which could not be
established – when this evidence was contradicted by substantial
other material on the record.[4] Id. at 1328-29.

     In its Remand Results, the Department declined to further
analyze or adjust the Thai benchmark, and instead elected to use
indicative values for land in Subic Bay as a more appropriate
benchmark for the value of New Zhongya's land use subsidy.
Remand Results at 11.  In doing so, the Department selected
indicative values from the CBRE Report for Subic Bay sites that
offered no specific information on levels of infrastructure.[5]

_____

[4] The ruling highlighted the unreasonable reliance on the claims
of a promotional web site, and a series of photographs that
could not be precisely dated, to indicate a high level of
infrastructure development for ZHTIDZ land when considered in
light of the extensive record submissions demonstrating a lower
level of infrastructure in place when New Zhongya began its
lease of the property in 2006. Zhaoqing Remand, 929 F. Supp. 2d.
at 1327-28 (citing Pl's Mot. at 5 and Zhongya Supplemental
Questionnaire Resp. at 297).

[5] This decision was based on the fact that the CBRE reports
listed two types of industrial land.  One of these types was
labeled "infrastructure in place," while the other had no
information on level of industrial amenities or development at
all.  Remand Results at 6.  The Department inferred that the
lack of a label could be taken as evidence that these sites had
a lower level of infrastructure and were therefore more
comparable to the ZHTIDZ land acquired by New Zhongya. Id.

The subsidy and the appropriate countervailing duty were then recalculated using this benchmark.

Responding to comments from the parties, the Department determined that its decision to use the Philippines rather than Thailand as an appropriate benchmark country for comparison with China was case-specific and that Thailand would continue to be used as the default national comparison for the reasons explained in LWS from the PRC. Id. at 9.  In addition, the Department rejected the Defendant-Intervenor's requests that it reopen the administrative record and gather either additional information on sites in Thailand or macroeconomic and demographic data that would support the use of the Philippines with data comparable to that gathered before selecting Thailand as the default comparison country in LWS from the PRC. Id. at 7, 9.

AEFTC now challenges the Department's determination on remand, claiming first that LWS from the PRC established a procedure for selecting an appropriate third country for comparison with China in less than adequate remuneration ("LTAR") subsidy cases.  Defendant-Intervenor argues that, as a controlling practice or precedent, LWS from the PRC requires Commerce to re-open the administrative record and develop additional data to justify the selection of benchmark land

values from the Philippines. Comments of the AEFTC on the
Department of Commerce's Final Results of Redetermination, ECF
No. 77 ("AEFTC Comments") at 5.

AEFTC's second claim is that the inadequacy of the record
data on the Subic Bay site prevents the Department from making a
reasonably accurate estimate of the ZHTIDZ land value subsidy.
This inadequacy, AEFTC alleges, can only be dealt with by
reopening the administrative record and accepting additional
submissions that would improve the accuracy of the benchmark,
specifically information on inflation rates in the Philippines
during the period. Id. at 6-7.

## STANDARD OF REVIEW

"The court will sustain the Department's determination upon
remand if it complies with the court's remand order, is
supported by substantial evidence on the record, and is
otherwise in accordance with law." Jinan Yipin Corp. v. United
States, __ CIT __, 637 F. Supp. 2d 1183, 1185 (2009) (citing 19
U.S.C. § 1516a(b)(1)(B)(i)).  Substantial evidence means "such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion."  Universal Camera Corp. v. N.L.R.B.,
340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v.

N.L.R.B., 305 U.S. 197, 229 (1938)).  Accordingly, when

reviewing agency determinations, findings, or conclusions for

substantial evidence, the court assesses whether the agency

action is reasonable given the record as a whole. Nippon Steel

Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).

In doing so, the court must consider any fact that "fairly

detracts from [the agency conclusion's] weight." Universal

Camera Corp., 340 U.S. at 488.  As importantly, a reviewing

court may not "displace the [agency's] choice between two fairly

conflicting views, even though the court would justifiably have

made a different choice had the matter been before it de novo."

Id.


                            **DISCUSSION**


    I.   The Selection of the Philippines as a Benchmark Country


        The first of AEFTC's claims is unpersuasive.  AEFTC argues

that the use of the Philippines for comparison with the PRC is

unreasonable because the Philippines was not selected through

the same process and in consideration of the same factors that

were used in LWS from the PRC to identify Thailand as an

appropriate benchmark country. AEFTC Comments at 4.


        Invoking the principle articulated in Hussey Copper, Ltd.

v. United States, 17 C.I.T. 993, 997, 834 F. Supp. 413, 418

(1993), that agencies deviating from their own established

practices must offer an adequate explanation for treating

similar situations differently,[6] AEFTC argues that the selection

of the Philippines benchmark for industrial land values can only

be justified by the same process of investigation and in

consideration of the same factors used to identify Thailand as a

valid comparison country in LWS from the PRC. AEFTC Comments at

4-5.  In support of this claim, AEFTC points out that the

Department intends to use the Philippines as a benchmark only in

this case and that the Department retains a preference for Thai

comparisons. Id. at 4 (citing Remand Results at 7-8).  The

Department's intention, AEFTC suggests, indicates clearly that

the Department itself lacks confidence in the validity of the

Philippines as a comparable market for industrial land.  Id. at

5.

---

[6]Hussey Copper, quoting Citrosuco Paulista, S.A. v. United
States, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088 (1988),
articulated the "general rule that an agency must either conform
itself to its prior decisions or explain the reasons for its
departure."  AEFTC neglects the context of this citation, which
continues directly: "[t]his rule is not designed to restrict an
agency's consideration of the facts from one case to the next,
but rather it is to insure consistency in an agency's
administration of a statute." Id.  The court in Hussey Copper
elaborated further, emphasizing the Department's "broad
discretion in its selection of methodology to implement the
statute" so long as this discretion is not abused or employed in
an arbitrary manner. Id.  Thus Hussey Copper supports, rather
than limits, reasonable consideration of the facts in each case
to inform the Department's reasonable methodological choices.

To correct this alleged error, AEFTC argues that the
Department must either conduct a more detailed investigation of
the Philippines to justify its use as a benchmark for Chinese
industrial land values or gather more information on industrial
properties in Thailand that lack significant infrastructure and
therefore meet the requirements of the remand. Id. at 5, 6.

The Department acknowledges that the Philippines was not
chosen through a process of investigation as rigorous or
detailed as that used in LWS from the PRC and that record
evidence on the Philippines is limited. Remand Results at 7;
Def.'s Response to Comments Regarding the Remand
Redetermination, ECF No. 80 ("Def.'s Response") at 7.  The
Department argues, however, that it is not compelled to follow
the LWS from the PRC process in selecting comparable countries
for comparison.  Commerce specifically notes that LWS from the
PRC reserves the Department's prerogative to make future
determinations based on a range of factors appropriate to each
case, including the availability of data. Remand Results at 7-8;
Def.'s Response at 8.

Electing not to gather additional data, the Department
argues that the only information presently on the record that
offers price data on land not specifically known to be developed
for industrial use comes from the 2007 CBRE Report and that such

data is only available for Subic Bay in the Philippines.  <u>Remand
Results</u> at 7-8.  Since the remand found the Department's use of
prices for developed industrial land with significant existing
infrastructure to be unjustified, the Department argues that the
selection of the Philippines is reasonable.  <u>Id.</u>

The Department is correct.  While not as well grounded in
record evidence as the selection of Thailand in <u>LWS from the
PRC</u>, the Department's selection of the Philippines as a
comparison country is not contrary to the Department's practice
and precedent.  In <u>LWS from the PRC</u>, the Department examined
several factors before reaching the conclusion that Thailand
provided the best benchmark for the subsidies provided by LTAR
land programs, including relative wealth, (represented by gross
national income per capita), population density, industrial
density, and the perceptions of foreign investors (represented
by reports from the Japan External Trade Organization as well as
the private firm CBRE).  <u>LWS from the PRC</u> at 67,909.

While the procedures used in this determination have
continued to guide the Department in some proceedings,[7] they were

_____

[7] <u>See, e.g.</u>, <u>Citric Acid and Certain Citrate Salts From the
People's Republic of China</u>, 79 Fed Reg. 108 (Dep't of Commerce
Jan. 2, 2014) (final results of administrative review, 2011) and
accompanying Issues & Decision Mem., A-570-937 (Dec. 26, 2013)
at 28, n. 168.

clearly not intended to establish a general policy for all land

LTAR investigations.  Rather, the choice of Thailand in <u>LWS from</u>

<u>the PRC</u> was at least in part driven by its economic similarity

to China's Shandong Province where the firms under investigation

had received their land use subsidies.  This indicated that the

selection of Thailand was not intended to set a new departmental

policy for all LTAR calculations involving any Chinese

industrial land, but was instead tailored to the facts of the

<u>LWS from the PRC</u> case.[8] <u>Id.</u>  To clarify this, the determination

in <u>LWS from the PRC</u> also emphasized both that the Department

might choose to rely upon other factors in future decisions

regarding LTAR land value comparisons and that the process of

developing a general policy to account for such land subsidies

was ongoing. <u>Id.</u>

    Relying on such other factors is exactly what the

Department has done in this case.  Specifically, in adopting

---

[8] Shandong's GNI per capita and population density, both
significantly above the Chinese national average, were found to
be nearer to the Thai levels and therefore to make Thailand a
better comparison. <u>Id.</u>  The land at issue in the instant
aluminum extrusions investigation is in Guangdong Province near
Hong Kong. <u>I&D Memo</u> at cmt. 13.  The emphasis on this regional
difference undermines the presumption that the Thai comparison
developed by the Department for <u>LWS from the PRC</u> should by
default be applied here, <u>Id.</u> at cmt. 24, and contradicts AEFTC's
claim that the department has a general "stated policy to use
Thai benchmarks to value PRC land LTAR programs" that is here
being disregarded. <u>AEFTC Comments</u> at 6.

Subic Bay as a benchmark in response to the <u>Zhaoqing Remand</u>, the
Department relied on the inclusion of the Philippines in the
<u>CBRE Report</u> to determine that the country is sufficiently
comparable to China for this purpose without prejudicing its
decisions in the future.[9] <u>Remand Results</u> at 9. Though the
criticisms raised by the AEFTC are not unreasonable, nothing in
<u>LWS from the PRC</u> requires a different result.

II.  <u>The Department's Refusal to Reopen the Administrative
     Record to Improve the Accuracy of the LTAR Benchmark</u>

---

[9] In the linked antidumping investigation, the Department found
the Philippines to be comparable to China in its level of
economic development as part of a review required to establish
surrogate values for factors of production under 19 U.S.C. §
1677b(c)(4)(B). <u>See</u> <u>Aluminum Extrusions from the People's
Republic of China</u>, 76 Fed. Reg. 18,524 (Dep't Commerce Apr. 4,
2011) (final determination of sales at less than fair value) and
accompanying Issues & Decision Memorandum, A-570-967 (Apr. 4,
2011) at cmt. 1(F) (defending the use of the Philippines as one
of several surrogate countries to establish a market economy
wage rate).  This finding of economic comparability has been
relied upon both in other investigations, e.g. <u>Certain Steel
Threaded Rod from the People's Republic of China</u>, 77 Fed. Reg.
27,022 (May 8, 2012) (preliminary results of administrative
review) at 27,025, and in the most recent administrative review
of the Aluminum Extrusions case. <u>Aluminum Extrusions from the
People's Republic of China</u>, 79 Fed. Reg. 96, (Dep't Commerce
Jan. 2, 2014) (final results of antidumping duty administrative
review and rescission) and accompanying Issues & Decision Mem.,
A-570-967 (Dec. 26, 2013) at cmt. 1.  These findings demonstrate
that Commerce generally considers the national economy of the
Philippines to be similar to that of China, supporting the
reasonableness of Commerce's choice here to use Philippines data
as a benchmark for estimating the value of the subsidy provide
by the LTAR program.

    AEFTC also objects to the adequacy of information available
on the record about the Philippines as a basis for comparison
with ZHTIDZ. AEFTC Comments at 6.[10]  AEFTC makes both the general
argument that the lack of record data prevents the Department
from making a reasonably accurate estimate of the ZHTIDZ land
value subsidy and the specific argument that inflation data on
the Philippines must be collected in order to establish a
subsidy estimate as accurate as the Thai benchmark that would
normally be used.  To accomplish this, AEFTC argues that the
Department should be required to reopen the administrative
record in order to provide the foundation for a more precise
valuation. Id.  AEFTC notes that the Department may reopen the
record in response to a remand and argues that it would be
appropriate to do so in this case to advance the purpose of the
remand. Thai Plastic Bags Indus. Co. v. United States, __ CIT
___, 895 F. Supp. 2d 1337, 1346 (Ct. Int'l Trade 2013); Qingdao
Sea-Line Trading Co., Ltd. v. United States, Slip Op. 13-102
(CIT Aug. 8, 2013).  The Defendant's response, in contrast,
emphasizes that the Department has the discretion to reopen the
record and that the determination of when it is appropriate to
do so is properly left to the Department. Def.'s Response at 7,

---

[10] In its redetermination, Commerce found that the Subic Bay sites
had a level of infrastructure lower than the Thai sites. Remand
Results at 7. No party challenges this finding.

citing <u>Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v.
United States</u>, 33 C.I.T. 695, 625 F. Supp. 2d 1339, 1356 n. 18
(2009).

AEFTC's most specific argument for compelling the
Department to reopen the record is the lack of any data that
would allow the Department to apply an appropriate discount for
Philippine inflation to the <u>CBRE Report's</u> indicative values for
Subic Bay properties.  In setting out their case, however, AEFTC
goes beyond the issue of accurately accounting for inflation and
cites three admissions by the Department that adequate data on
investor perceptions and Philippine demography are not available
to conduct an investigation of the Philippines comparable to
that conducted of Thailand in <u>LWS from the PRC</u>.[11] AEFTC Comments
at 6.  Though not clearly stated, the argument suggests that it
is impossible to establish an accurate benchmark for the ZHTIDZ
land use subsidy without these data and that the only way to
deal with this problem is to reopen the administrative record
and gather sufficient information to conduct an investigation of
the Philippines comparable to <u>LWS from the PRC</u>.

---

[11] AEFTC correctly identifies the three types of evidence used by
Commerce in <u>LWS from the PRC</u> that established Thailand as an
adequate benchmark in that case – macroeconomic data,
demographic information, and a study of the perceptions of
foreign investors.

No party contests the Department's finding that the Subic Bay benchmark has a lower level of infrastructure in place than the Thai properties originally used and is therefore more comparable to ZHTIDZ. See supra n. 9.  It follows that we must reject AEFTC's argument.  Because the Department is not compelled by its own procedures or the demands of substantial evidence to conduct a study of the Philippines comparable to LWS from the PRC, the information on investor perceptions and Philippine demography highlighted by AEFTC is not necessary.  It would be illogical to remand based on the failure to collect information that the Department has demonstrated it does not need.

This leaves AEFTC's specific objection to the Department's failure to correct the Philippines price data provided in the CBRE Report for inflation.  AEFTC argues that the lack of data on inflation of the Philippine peso prevents the Department from discounting the Subic Bay land values for the period that separates the CBRE Report estimates of 2007 from the 2006 acquisition of the ZHTIDZ land by New Zhongya. AEFTC Comments at 7.  Since the Thai land prices were so discounted in response to criticism, AEFTC argues that failing to reopen the record in order to discount Philippine price data is not reasonable. Id., citing I&D Memo at cmt. 24.

The Department's defense of its decision not to discount
for inflation rests on the relatively short time separating New
Zhongya's acquisition of land use rights in June and October of
2006 and the second quarter of 2007 from which the indicative
values in the CBRE Report were drawn.[12] Remand Results at 10;
Def's Response at 9.

Again the Department is correct.  Neither the Department's
failure to discount Philippine prices for inflation over a
period of between eight months and one year, nor its refusal to
reopen the record to gather such information, can be considered
unreasonable.

Three factors support the conclusion that Commerce is
operating within the bounds of its discretion.  First, though
the Department did discount the Thai benchmark real estate
prices for inflation in its original determination, AEFTC does
not allege that the Department has violated an established
methodology or practice by failing to do so here. I&D Memo at
cmt. 24.

Second, the Department's decision to discount Thai property
values in the Final Determination is differentiable from the

---

[12] The specific table in the CBRE Report from which the
indicative values for Subic Bay properties are taken labels
these as prices at the close of the second quarter of 2007. CBRE
Report at 12, ECF No. 82-2 at 66.

decision not to do so for the Philippines along precisely the lines invoked by the Department.  The Thai land values used in the Final Determination are drawn from a CBRE Report citing prices in the first quarter of 2008 rather than the second quarter of 2007.  Id.  This is entirely consistent with the Department's explanation that the shorter time period justifies a different decision.

Third, if the Department had determined that discounting for Philippine inflation were appropriate, evidence presently on the record could provide a basis for doing so.  The CBRE Report from which the Subic Bay indicative values were drawn provides an inflation rate of 2.4% for the Philippine peso as of May 2007.[13]  CBRE Report at 1, ECF No. 82-2 at 55.  While it is unclear from the Department's submissions why it would be inappropriate to use this number to discount the Subic Bay values, its presence on the record invalidates AEFTC's claim that reopening the record would be the only way to address the inaccuracy introduced into the subsidy estimate by inflation.

---

[13] The CBRE Report provides both the headline inflation rate of 2.4% and a core inflation rate of 2.6%.  It also presents an explanation for the divergence between core and headline figures based on recent tax changes as part of its general discussion of the investment environment of the Philippines.  It is puzzling that neither party addresses the existence of these numbers on page 1 of the CBRE Report before moving on to arguments over the necessity of reopening the administrative record to collect inflation data.

Taken together, these factors undermine AEFTC's argument
that the Department should be compelled to reopen the
administrative record to account for inflation.  Since
Commerce's benchmark selection was not unreasonable, the
Department's failure to reopen the record was not an abuse of
discretion. Sterling Fed. Sys., Inc. v. Goldin, 16 F.3d 1177,
1182 (Fed. Cir. 1994) (quoting Gerritsen v. Shirai, 979 F.2d
1524, 1529 (Fed. Cir. 1992)) (stating that an agency abuses
discretion, inter alia, when its determination "follows from a
record that contains no evidence on which the [agency] could
rationally base its decision." (alteration in original)) See
Essar Steel Ltd. v. United States, 678 F.3d 1268, 1278 (Fed.
Cir. 2012)(emphasizing the high threshold for overturning the
Department's decisions regarding the collection of record
evidence).

**CONCLUSION**

For the foregoing reasons, the Department's selection of the Subic Bay indicative land value as a benchmark for estimating the subsidy provided to New Zhongya by land use rights in the ZHTIDZ is affirmed. Judgment shall be issued accordingly.

It is so ORDERED.


                                    /s/ Donald C. Pogue
                                   Donald C. Pogue, Chief Judge


        Dated: February 19, 2014
        New York, NY